**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**


**WEST AMERICAN INSURANCE COMPANY,**
                    **Plaintiff,**

**v.**                                                          **Civil Action No. 2:05cv506**

**JOHNS BROTHERS, INC.,**
**and**
**PAULA THOMPSON, individually and**
**as parent and next friend of ROSS**
**CLAPHAM and KENDAL CLAPHAM,**
**and**
**PAUL CLAPHAM,**
                    **Defendants.**


## ORDER AND OPINION

This matter is presently before the court on cross-motions for summary judgment.

Plaintiff, West American Insurance Company, seeks a declaratory judgment that it is not required

to defend nor indemnify Johns Brothers, Inc., a policy holder, in a lawsuit filed against Johns

Brothers in state court by one of Johns Brothers' clients.  After extensive briefing on the cross-

motions for summary judgment, the parties agreed that a trial does not appear necessary and that

in light of the parties stipulation to the operative facts and extensive briefing, oral argument on

the cross-motions also does not appear necessary.  After examination of the briefs and record, the

court agrees that oral argument is unnecessary because the facts and legal arguments are

adequately presented in written form.  For the reasons set out herein, the court **GRANTS**

defendant Johns Brothers' motion and **DENIES** plaintiff's motion.

## I.   Factual and Procedural Background

This matter arises from a heating oil spill that occurred at the residence of Paula Thompson, Paul Clapham, Ross Clapham, and Kendal Clapham ("the Claphams").  Johns Brothers, a residential heating oil supplier, both supplied heating oil to the Claphams' home and maintained the Claphams' heating system pursuant to a service contract.  The underlying damage prompting the Claphams' lawsuit against Johns Brothers occurred as a result of a corroded oil return line that started leaking oil sometime between October 2004 and the end of January of 2005.  During such period, the Claphams repeatedly contacted Johns Brothers complaining of oil odors inside their home and Johns Brothers made several visits to the Claphams' residence to monitor the heating system, deliver oil, and respond to the Claphams' complaints.  Heating oil was delivered on the following dates and in the following amounts: October 29, 2004, 254.2 gallons; December 23, 2004, 144 gallons; and January 28, 2005, 162.9 gallons (Pretrial Conf. Order at I.15). Other visits were made on the following dates and the following services were perfomed: October 30, 2004, Johns Brothers replaced the furnace's fuel pump and checked operations; January 17, 2005, the furnace was tested to see if it still qualified for the service agreement; January 30, 2005, Johns Brothers discovered oil standing on the ground in the crawl space underneath the Claphams' home and closed off the oil tank; and January 31, 2005, the leaking oil return line was repaired (Compl. ¶¶ 12-19; Pretrial Conf. Order at I.21-22).

West American filed the instant action pursuant to this court's diversity jurisdiction seeking a declaratory judgment establishing that the damages sustained by the Claphams are not covered by the Commercial General Liability ("CGL") policy that plaintiff issued to Johns Brothers.  West American and Johns Brothers agree that coverage turns on the application of the

insurance policy's "Pollution Exclusion" to the facts before the court.[1]  The court has previously entered an Order in this matter dismissing cross-claims for the underlying damages filed by the Claphams, and the parties have stipulated to the dismissal of two co-defendants: the Virginia Department of Environmental Quality and Petrochem Recovery Services, Inc., the company that provided oil remediation services on the Claphams' property.  The cross-motions for summary judgment have been fully briefed and are now ripe for review.

## II.  Standard of Review

Summary judgment is only appropriate when the court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Terry's Floor Fashions, Inc. v. Burlington Indus., 763 F.2d 604, 610 (4th Cir. 1985); Fed. Rule. Civ. Pro. 56(c).  Although the court must draw all inferences in the non-movant's favor, once the movant has properly filed evidence supporting summary judgment, the non-moving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts in the form of exhibits and sworn affidavits illustrating a genuine issue for trial.  Celotex, 477 U.S. at 322-24; Cray Communications, Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 393-94 (4th Cir. 1994).  In other words, while the movant carries the burden to show the absence of a genuine issue of material fact, when such burden is met, it is up to the non-movant to establish the existence of such an issue.  Id.; Matsushita Elec.

---

[1]  Although plaintiff originally advanced numerous justifications for its position that it is not under a duty to defend Johns Brothers, after completing discovery, the parties agree that the "major issue in this case is whether the pollution exclusion, contained in the policy, applies to the facts and circumstances of this case" (Pretrial Conf. Order at VII.A).

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

Summary judgment is not reserved for situations where no factual issues are in dispute; rather, to find against the moving party the court must find both that material facts are in dispute and that the disputed issues are genuine. Fed Rule of Civ. Proc. 56(c). Disputed facts are material if they are necessary to resolving the case and to be genuine they must be based on more than speculation or inference. See Thompson Everett, Inc. v. National Cable Advertising, L.P., 57 F.3d 1317, 1323 (4th Cir. 1995). If the moving party advances evidence suggesting that there is not a genuine and material dispute, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," as the existence of a scintilla of evidence is insufficient to defeat a motion for summary judgment. Matsushita, 475 U.S. at 586; Catawba Indian Tribe of S.C. v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992). Resolution of the instant matter through a grant of summary judgment is "especially appropriate . . . because the construction of insurance contracts is a legal question well suited for resolution by the court." Clark v. Metropolitan Life Ins. Co., 369 F. Supp. 2d 770, 774 (E.D. Va. 2005).

## III.   Analysis

West American and Johns Brothers agree that the resolution of this matter turns on the application of the pollution exclusion contained in the CGL policy issued by West American.[2] The pertinent text of the pollution exclusion states:

**2. Exclusions**
This insurance does not apply to:
. . .
**f. Pollution**

_____

[2] The pollution exclusion included in the CGL policy before the court utilizes standard language that is typically referred to as the "absolute pollution exclusion."

4

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
> . . .
>> (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

(Def. Mo. Summ. J. Ex.E at OHIO 472-73).[3]  In applying the pollution exclusion to the instant facts, there are three separate questions the court must address.  First, does heating oil qualify as a "pollutant."  Second, even if heating oil qualifies as a pollutant in most circumstances, did the parties intend heating oil to be covered under the insurance policy at issue as the majority of Johns Brothers' revenue is derived from the sale of fuel oil and the service of equipment that utilizes such oil.  Third, was Johns Brothers "performing operations" at the Claphams' home at the time the oil was released as contemplated by the language of the pollution exclusion.

### A.  Is Heating Oil a "pollutant"?

Johns Brothers argues that heating oil is not a "pollutant" under the insurance policy and therefore, damages caused by the release of heating oil into the ground are within the policy's coverage.  The definition section of the CGL policy defines a "pollutant" as:

> [A]ny solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

(Policy OHIO 485).  Johns Brothers contends that the above quoted definition is ambiguous with respect to heating oil and therefore, must be construed in favor of coverage.  See Lincoln Nat. Life Ins. Co. v. Commonwealth Corrugated Container Corp., 229 Va. 132, 137, 327 S.E.2d 98,

---

[3] The CGL policy, attached as exhibit E to Johns Brothers' motion for summary judgment, will hereinafter be cited to as ("Policy") followed by the Bates stamp number.

101 (1985) ("Because the policy language is ambiguous, it will be construed strictly against the insurer . . . [and] the court will adopt that construction which will afford coverage."). Contract language is deemed ambiguous "when it may be understood in more than one way or when it refers to two or more things at the same time." Granite State Ins. Co. v. Bottoms, 243 Va. 228, 234, 415 S.E.2d 131, 134 (1992). However, language should not be deemed ambiguous "merely because the parties disagree as to the meaning of the terms used." Plunkett v. Plunkett, 271 Va. 162, 167, 624 S.E.2d 39, 42 (2006).

In contrast, West American contends that the pollution exclusion is unambiguous and that the court should look to federal and state statutes and state regulations in order to determine what qualifies as a pollutant. See City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 628 S.E.2d 539 (2006). In City of Chesapeake, a case involving the release of trihalomethanes ("THMs"), the Virginia Supreme Court was tasked with answering the certified question of whether the absolute pollution exclusion barred coverage for damages allegedly caused by the release of THMs into the City's water supply. Relying on the federal statute regulating drinking water, 42 U.S.C. § 300g-1, the Court concluded that because the statute defined THMs as contaminates and because the insurance policy defined "pollutants" to include "contaminants," THMs were pollutants within the policy. City of Chesapeake, 628 S.E.2d at 541. Furthermore, even though the limited Virginia caselaw on point prompted both parties to request that the court "examine how other jurisdictions have resolved similar insurance contract disputes," the Virginia Supreme Court found that such inquiry was "unnecessary . . . because the law of the Commonwealth and the plain language of the insurance policy provide the answer . . . ." Id. at 541-42.

Although the Virginia Supreme Court utilized the federal statute regulating drinking

6

water to help define the term "contaminant," the federal statute relied upon was directly

implicated by the underlying lawsuit which alleged pollution of the City's drinking water.  Here,

Johns Brothers contends that federal statutes should not be considered as there is no statute

directly implicated by the facts of this case.  Furthermore, Johns Brothers cites cases from other

jurisdictions which conclude that even if federal statutes are considered, heating oil is not a

"pollutant" because the Comprehensive Environmental Response Compensation and Liability

Act (CERCLA) expressly excludes crude oil and petroleum.[4]  Plaintiff recognizes that CERCLA

does not regulate petroleum but highlights the federal "Oil Pollution Act of 1990," and argues

that such Act, dedicated entirely to regulating all forms of oil, including "fuel oil," establishes the

longstanding view that oil is a pollutant.[5]  Furthermore, plaintiff cites several Virginia statutes

that indicate that oil and other forms of petroleum are pollutants; however, such statutes also do

not directly apply to the underlying facts of the case at bar.  See, e.g., Va. Code Ann. § 1-405

(regulating federal land reverting to the Commonwealth and classifying "Environmental

contamination" as "any hazardous waste, substance or toxic material, or its discharge or release,

that is regulated under any environmental law or regulation applicable to the property, and shall

include petroleum (including crude oil) . . . ").[6]

---

[4] CERCLA, 42 U.S.C. § 9601 et seq., is the federal statute that regulates "hazardous substances" and it expressly excludes petroleum from its coverage.

[5] The Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., regulates oil spills into navigable waterways and adjoining shorelines.

[6] Additionally, plaintiff argues that the Virginia Administrative Code regulates both underground and aboveground petroleum storage tanks and recognizes the potential for environmental contamination caused by leaking tanks.  See 9 Va. Admin. Code § 25-580-10 et. seq. (Underground Storage Tanks: Technical Standards and Corrective Actions Requirements); 9 Va. Admin. Code § 25-91.10 et. seq. (Facility and Above Ground Storage Tank Regulation).

After carefully considering the arguments outlined above, as well as well as the language in the CGL policy, the court concludes that heating oil is a "pollutant" within the pollution exclusion before the court.  Addressing the same question presently before the court, albeit with a different substance, the Virginia Supreme Court recently instructed that inquiry into caselaw from other jurisdictions is "unnecessary . . . [if] the law of the Commonwealth and the plain language of the insurance policy provide the answer . . . ."  City of Chesapeake 628 S.E.2d at 542.  Thus, the court should consider the language of the policy, giving words that are not expressly defined their "usual, ordinary, and popular meaning," to determine if the plain language of the policy provides the answer.  Id. at 541 (quoting D.C. McClain, Inc. v. Arlington County, 249 Va. 131, 135-36, 452 S.E.2d 659, 662 (1995)).  The court declines to reach the question as to whether considering unrelated federal or state statutes is appropriate as the ordinary meaning of the word "contaminant" encompasses fuel oil leaking out of fuel lines into the soil.[7]  A contrary conclusion would invalidate any justification for the extensive Virginia regulatory framework surrounding aboveground and belowground petroleum storage tanks.  See, e.g., 9 Va. Admin. Code § 25-91-10 (discussing the regulation's goal of developing standards

---

[7] If the court had deemed it proper to rely on unrelated federal and state statutes to aid in defining the term "contaminant," the court would also conclude that heating oil is a contaminant and therefore a "pollutant."  Although it is undisputed that CERCLA expressly excludes oil from its coverage, CERCLA regulates the release of "hazardous waste" and does not purport to define the term "contaminant."  The fact that an oil spill is not a release of "hazardous waste" is inconsequential in this court's determination of whether it qualifies as the release of a "contaminant."  Considering statutes that squarely address contamination, a Virginia statute that governs certain environmental restoration sites includes petroleum as a substance that causes "contamination"; therefore, petroleum must be a "contaminant."  See Va. Code Ann. § 58.1-3664 (classifying property as an "Environmental restoration site" if it "contains or did contain environmental contamination from the release of hazardous substances, hazardous wastes, solid waste or petroleum . . . ").  Likewise, one must look no further than the title of the federal "Oil Pollution Act of 1990" to determine that oil has been regulated as a pollutant for over a decade.

8

and procedures for aboveground oil storage facilities "relating to the prevention of <u>pollution</u> from

new and existing aboveground storage tanks").  Likewise, a common sense approach to defining

environmental pollution includes heating oil leaking into the soil that results in the involvement

of the Virginia Department of Environmental Quality, a professional remediation company and

cleanup effort apparently costing in excess of $25,000, and the allegedly severe diminution in

property value resulting solely from the fact that spilled oil cannot be entirely recaptured without

demolishing a residence.[8]

Furthermore, a plain reading of the pollution exclusion clause <u>in its entirety</u> indicates that

"fuels, lubricants and other operating fluids" are "pollutants."  It is undisputed that the subsection

of the pollution exclusion applicable to the instant matter is subsection (d), which applies to a

site or location not owned by the insured to which the insured brings "pollutants."   After setting

forth what qualifies as excluded under subsection (d) the policy provides:

> However, this subparagraph does not apply to:
> (I) "Bodily injury" or "property damage" arising out of the escape of fuels,
> lubricants or other operating fluids which are needed to perform the normal
> electrical, hydraulic or mechanical functions necessary for the operation of
> "mobile equipment" or its parts, if such fuels, lubricants or other operating
> fluids escape from a vehicle part designed to hold, store or receive them. This

---

[8] Although the court does not base its decision on cases from outside Virginia because the plain language of the policy and law of the Commonwealth are sufficient to resolve the instant matter, the Seventh Circuit's opinion in <u>Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.</u>, 976 F.2d 1037, 1043 (7th Cir. 1992), is instructive as the opinion recognizes that when viewed in isolation the term "contaminant" is "virtually boundless" but that courts from varying jurisdictions "have taken a common sense approach" to limit the scope of such clauses.  The Seventh Circuit found that the similarity across such cases is that injuries from "everyday activities gone slightly, but not surprisingly, awry," such as spilling a bottle of Draino or paint damage to vehicles caused by the errant spraying of a bridge, are not considered pollution.  <u>Id.</u> The "common sense" approach espoused by the Seventh Circuit is analogous with the Virginia approach of applying the "usual and ordinary meaning" of the term "contaminant" or "pollutant" which is not broad enough to encompass a spilled bottle of Draino or errant paint, but would include leaking heating oil storage tanks or fuel lines and the resulting unrecoverable spilled oil.

> exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids . . . .

(Policy OHIO 473).  Such exception, read in conjunction with the definitions provided in the policy, plainly establishes that coverage is not excluded if "fuels, lubricants or other operating fluids" are unintentionally leaked out of the insured's bulldozers, forklifts and other mobile machinery.  However, if petroleum products never fall within the pollution exclusion for lack of being "pollutants," this exception to the exclusion would be meaningless as "fuel and operating fluids" such as gasoline and oil would already be categorically excluded.  As the Virginia Supreme Court recently reiterated: "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly."  City of Chesapeake, 628 S.E.2d at 542 (quoting D.C. McClain, 249 Va. at 135-36, 452 S.E.2d at 662).  To avoid construing the above quoted exception as "meaningless," the court concludes that but for the exception, gas or oil leaking from a bulldozer on a third parties' property must potentially be excluded from coverage, meaning such materials must qualify as "pollutants."  Such an interpretation is certainly "reasonable" in light of the plain meaning ascribed to the terms contaminant and pollutant.  Furthermore, the remainder of the above quoted provision bolsters the court's position as it provides that the "mobile equipment" exception does not apply if "such fuels, lubricants or other operating fluids" are intentionally discharged; indicating that the pollution exclusion may bar coverage if the insured intentionally discharges "fuel or other operating fluids."  Again, such a clause would be meaningless if such substances were categorically excluded.  Therefore, based on the plain meaning of the terms contaminant and pollutant, as well as consideration of the exception to the pollution exclusion,

the court finds no ambiguity and determines that heating oil is a pollutant within the policy before the court.

**B.  Did the parties intend to exclude heating oil from the definition of "pollutant"?**

Although the preceding section concludes that heating oil is a pollutant, the court addresses this question separately because Johns Brothers argues that even if heating oil is a pollutant generally, the court should find that, on these facts, the parties intended heating oil to be excluded from the definition of "pollutant."  As highlighted by Johns Brothers, the undisputed facts establish that West American insured Johns Brothers for several years prior to the accident and calculated a portion of the insurance premium based on Johns Brothers' classification as a "Fuel Oil Dealer" as well as the total number of gallons of heating oil Johns Brothers actually delivered to its customers.[9]  Johns Brothers argues that a "CGL for fuel oil dealers is worthless if fuel oil is excluded" (Def. Rebuttal 15), and that plaintiff cannot collect a premium based on the amount of oil sold and then claim that oil damage is excluded from coverage.[10]  At a minimum, defendant contends that utilizing the defendant's business classification in the premium calculation creates an ambiguity that must be resolved in its favor.  In contrast, plaintiff argues that because the City of Chesapeake opinion determined that an identical pollution exclusion was unambiguous, this court must do the same.  Additionally, plaintiff argues that the court should focus on the language of the policy and not the underlying premium calculation.

After considering the parties' arguments, relevant caselaw, and the text of the policy, the

[9]  Of the approximately $40,000 premium paid for the CGL policy, roughly $5,000 was paid under the classification "Fuel Oil or Kerosene Dealers" and such premium was directly tied to the amount of Fuel Oil delivered, an estimated 2,750,000 gallons (Def. Mo. Summ. J. Ex.E).

[10]  Defendant's argument is necessarily foreclosed by the fact that the ultimate conclusion of this court is that, on these facts, coverage exists.

court determines that the plain language of the policy does not evince an intent to treat heating oil in a manner inconsistent with all other "pollutants."  Although it is true that the nature of the defendant's business impacted the policy premium, there are two reasons why such fact does not alter the court's conclusion that heating oil is a pollutant under the policy at issue: first, as plaintiff effectively argues, the court should begin its analysis with the language of the policy itself, and if such language is unambiguous the inquiry ends there; and second, even if the court considered the fact that the amount of fuel oil delivered impacted the policy rate, such factor falls far short of overriding the express pollution exclusion, and merely reflects the fact that West American utilizes an underwriting system that considers all the activities of a company seeking insurance.

First, the court is not only required to begin its analysis with the language of the contract, but if such language is unambiguous, that is also where inquiry should end.  See Foreign Mission Bd. of Southern Baptist Convention v. Wade,  242 Va. 234, 237, 409 S.E.2d 144, 146 (1991) ("When a court considers a written contract, the intent of the parties is presumed to be embodied in the contractual terms.  If those terms are clear and unambiguous, it is the duty of the court to enforce them.").  Interpreting a contract is a question of law and the contract must be "construed as written, without adding terms that were not included by the parties." City of Chesapeake, 628 S.E.2d at 542 (quoting Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984)).   As discussed in the preceding section, both the common meaning of the term "contaminant" and the text of the pollution exclusion indicate that heating oil released into the ground qualifies as a pollutant.  One clause that was clearly not "added" into the policy by the parties is that heating oil should be treated differently from other pollutants.  Therefore, the court concludes that the insurance policy unambiguously excludes coverage for the release of heating oil in all

enumerated scenarios.[11]  See Bottoms, 243 Va. at 234, 415 S.E.2d at 134 ("An ambiguity, if one

exists, must be found on the face of the policy."); Auto-Owners Ins. Co. v. Potter, 105 Fed.

Appx. 484, 492-93 (4th Cir. 2004) (unpublished) ("Because we find that no ambiguity existed in

the . . . contractual terms, we need not further entertain Appellants' argument that the CGL is

ambiguous because it purportedly does not provide coverage for claims arising out of [the

insured's] central business activity.").[12]

Second, even if the court considers the fact that the policy premium was based in part on

the nature of defendant's business, such fact does not override the express language of the

pollution exclusion.  Johns Brothers' position that the parties must have intended fuel oil damage

to be unconditionally covered by the policy merely because part of the premium was calculated

based on defendant's status as a fuel oil delivery company is plainly speculative.  Perhaps such

premium was based on the fact that heating oil companies' daily routines frequently generate

property damage as oil delivery trucks routinely arrive unannounced at customers' homes and

employees are required to maneuver the large trucks close to residences and extend large hoses

across customers' properties, often times into backyards, in order to deliver oil.  Perhaps it is

---

[11]  Johns Brothers attempts to parallel the facts of the instant matter to the facts of a
Virginia Circuit Court case in which the court declared the absolute pollution exclusion to be
ambiguous.  See Unisun Ins. Co. v. Schulwolf, 53 Va. Cir. 220, 2000 WL 33340659, No.
L97-3179, *4 (Va. Cir. Ct. Aug. 23, 2000) (Not Reported in S.E.2d).  Such opinion, however, is
unpersuasive because it is readily distinguishable from the present matter as Schulwolf involved
young children getting sick from ingesting lead paint chips inside a rented residence.  Id.  The
court in Schulwolf determined that the pollution exclusion was ambiguous only with respect to
whether it applied when the alleged pollutant never reached the "environment."  In contrast, here,
the heating oil seeped into the ground underneath the Claphams' home, cannot be fully cleaned
up, and the oil's future migration and potential environmental impacts are unknown.

[12]  Although the Potter opinion applied North Carolina law, it is nevertheless instructive
as it addresses circumstances similar to those presently before the court and is in accord with this
court's determination of the resolution that the Virginia Supreme Court would likely reach.

based on the increased risk associated with transporting a flammable substance.  Such alternative explanations are intentionally speculative as it is clearly not within the purview of the court to analyze the complex factors that impact an insurance company's underwriting calculation. Likewise, the court will not require plaintiff to justify its motivations behind the premium charged to Johns Brothers as the underwriting process does not create coverage, the language of the policy and its applicable exclusions do.[13]  Although the court recognizes that some jurisdictions have held that oil or gas was not a pollutant primarily because the insured's main business revolved around such product,[14] it is unnecessary for this court to consider the wisdom of such results as the "law of the Commonwealth and the plain language of the insurance policy provide the answer . . . ."  City of Chesapeake, 628 S.E.2d at 542.

Here, the insurance contract states that damage caused by the "seepage, migration, release or escape of 'pollutants'" is not covered in scenarios enumerated in the policy.  As heating oil is a pollutant, the policy clearly excludes coverage for damages caused by the release of heating oil in all enumerated circumstances.  This remains true even if Johns Brothers subjectively believed that damages caused by heating oil were always covered because the court must rely on the language of the policy to determine the parties' intent.  See Wade, 242 Va. at 237, 409 S.E.2d at 146 ("[T]he intent of the parties is presumed to be embodied in the contractual terms.").[15]

_____

[13] The documentation of the premium calculation that Johns Brothers relies upon is listed in the section of the policy documents titled "Summary of Activity by Location."

[14] See, e.g., American States Ins. Co. v. Kiger, 662 N.E.2d 945, 948 (Ind. 1996); Hocker Oil Co., Inc. v. Barker-Phillips-Jackson, Inc., 997 S.W.2d 510 (Mo. App. 1999).

[15] Although the court's finding that the policy does not always cover Johns Brothers' central business activity may appear "strange" or "disturbing," the court must "determine the rule that the [Virginia] Supreme Court would probably follow, not fashion a rule which [it], as an independent federal court, might consider best." Kline v. Wheels by Kinney, Inc., 464 F.2d 184,

Therefore, considering the language of the policy that <u>creates and excludes coverage</u>, the court finds that no ambiguity exists; likewise, the policy language fails to indicate that the parties intended heating oil to be treated differently from all other pollutants.  <u>See</u> <u>Bridgestone/Firestone, Inc. v. Prince William Square Associates</u>, 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995) ("The law will not insert by construction, for the benefit of a party, an exception or condition which the parties omitted from their contract by design or neglect.").

### C. Was Johns Brothers "performing operations" at the time of the oil leak?

Although the preceding sections of this Order determine that the policy excludes coverage for damages caused by the release of heating oil, such conclusion only applies to circumstances specifically enumerated in the pollution exclusion.  For damages occurring on property owned by another to which Johns Brothers brought a pollutant, such as delivering heating oil to the Claphams' residence, the exclusion only applies if the damage occurred while the insured was "performing operations" (Policy OHIO 0473).  Johns Brothers naturally contends that "operations" were completed each time oil was delivered or heating system services were completed.  West American counters with two arguments: first, that subsection (d) of the pollution exclusion should be read as referencing only the location at which pollution occurs and not as having an associated temporal requirement; and second, that if subsection (d) does include

---

187 (4th Cir. 1972).  Notably, a federal district court applying Georgia law to identical policy language concluded that diesel fuel was a pollutant because "the language of the insurance policy, broad though it may be, is unambiguous" and the court reached such conclusion "[e]ven though the court is disturbed by the result that such an interpretation dictates."  <u>Owners Ins. Co. v. Farmer</u>, 173 F. Supp. 2d 1330, 1334 (N.D. Ga. 2001).  Likewise, here, the court must apply the contract as written, even if the contract excludes coverage for the defendant's central business activity in many circumstances.  <u>See</u> <u>Kiger</u>, 662 N.E.2d at 948 (rejecting the insurer's position that a "garage policy" sold to a gas station did not include coverage for gasoline leaks as "strange"; however, recognizing that "[i]t remains true . . . that if the policy clearly excludes such coverage, that contract will be enforced").

a temporal element, that Johns Brothers was "performing operations" in that Johns Brothers

delivered oil on its own schedule and was acting under a service contract that required year long

monitoring and maintenance.  Although there is no Virginia caselaw on point, Virginia precedent

does establish that the burden is on West American to prove that the exclusion applies and that

language "purporting to exclude coverage for certain events will be construed most strongly

against the insurer."  Johnson v. Insurance Co. of North America, 232 Va. 340, 345, 350 S.E.2d

616, 619 (1986).  As discussed below, the court concludes that West American failed to carry

such burden.

　　　　Subsection (d) of the pollution exclusion, the only subsection relevant to the instant facts,

governs the release of a pollutant:

> At or from any premises, site or location on which any insured or any contractors
> or subcontractors working directly or indirectly on any insured's behalf are
> performing operations if the "pollutants" are brought onto the premises, site or
> location in connection with such operations by such insured, contractor or
> subcontractor.

(Policy OHIO 473) (emphasis added).  First, considering whether or not such provision includes

a temporal element, because there is no controlling caselaw on point, the court must focus on the

plain meaning of the text to determine if ambiguity exists.  Although Johns Brothers cites several

out of state cases to support its interpretation of such clause, defendant's comparison of the text

in subsection (d) of the pollution exclusion to subsections (a) (b) and (c) is much more

persuasive.  Notably, subsections (a) and (b) refer to pollution on a site "which is or was at any

time owned or occupied" by the insured, or land "which is or was at any time" used by the

insured for storing or disposing of waste, whereas subsection (d) only refers to a location where

the insured, or those acting on the insured's behalf, "are performing operations" (Policy OHIO

473) (emphasis added).  The fact that the preceding subsections expressly encompass both past

and present activities, yet subsection (d) only uses language to suggest present activities, plainly establishes that a temporal element was intended in subsection (d).[16] See Halifax Corp. v. First Union Nat. Bank,  262 Va. 91, 100, 546 S.E.2d 696, 702 (2001) (stating that rules of statutory interpretation dictate that when specific language is included in one section but omitted in another section courts "presume that the exclusion of the language was intentional").

        Although plaintiff contends that there is no temporal requirement in subsection (d), plaintiff presents little justification for such argument and the court finds no support in either a plain reading of the pollution exclusion clause as a whole or caselaw from any jurisdiction. Furthermore, even if plaintiff is correct that it is reasonable to read subsection (d) in such a manner, at best plaintiff has established a reasonable alternative reading of such clause which renders the clause ambiguous.  See Action Auto Stores, Inc. v. United Capitol Ins. Co., 845 F. Supp. 428, 435 (W.D. Mich. 1993) (relying on "traditional methods of contract interpretation" to determine that the phrase "are performing operations" was ambiguous because there are several ways to reasonably interpret such phrase including that it "meant to define the property both physically and temporally" or that it meant "to define 'that particular part of real property,' distinguishing it from the other real property existing at the worksite").  As this court is required to construe ambiguous language "strictly against the insurer" and "adopt that construction which will afford coverage," the court must construe subsection (d) of the pollution exclusion to require that Johns Brothers was actively "performing operations" when the release of the pollutant occurred.  Commonwealth Corrugated Container Corp., 229 Va. at 137, 327 S.E.2d at 101.

_____

        [16] Plaintiff's argument that such a reading would render the exclusion "virtually meaningless" and would allow an insured to avoid the pollution exclusion if a release occurred during the night on a multi-day job is unpersuasive as a multi-day job would undoubtably be viewed by the court as a continuous operation within the purview of subsection (d).

In the alternative, Johns Brothers argues that if the court construes subsection (d) to include a temporal requirement, that Johns Brothers' contractual duty to monitor oil and maintain the Claphams' heating system qualifies as "performing operations."[17]  Specifically, West American highlights the fact that Johns Brothers' responsibilities to the Claphams included "constant monitoring and estimating of claimants' oil needs, unprompted oil deliveries scheduled by Johns Brothers in accordance with its estimation of the claimants' oil needs, and Johns Brothers' continuous responsibility to service and maintain claimants' heating system" (Pl. Rebuttal 7-8).  Likewise, plaintiff characterizes Johns Brothers' activities as "ongoing visits in October 2004 through January 2005," and highlights that a John Brothers' employee made an unprompted visit on January 17, 2005 "to ensure that the service agreement was being complied with and to ensure that the furnace was accessible for service and repair, presumably to facility maintenance, repair and monitoring" (Pl. Rebuttal 8-9).  In contrast, Johns Brothers argues that after each heating oil delivery or service call was completed, defendant's operations ceased. Defendant attempts to support its position by citing language from the "Products-completed operations hazard" provision of the contract which states that "work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be treated as completed" (Policy OHIO 485).[18]

---

[17] Plaintiff also briefly advances a related theory that recognizes a temporal requirement but argues that it only modifies the clause referring to "contractors or subcontractors" and not the clause referring to work performed by the insured.  Such argument, however, is unpersuasive, cites no case law, and at best presents an alternative reasonable reading of the contract which would result in a finding of ambiguity.  Such ambiguity would again be resolved in defendant's favor, requiring the court to read the temporal requirement as modifying both clauses.

[18] The parties devote substantial effort to addressing whether the "Products-completed operations hazard" provision trumps the pollution exclusion, that is, once operations are complete, the pollution exclusion no longer operates to bar coverage.  However, a plain reading

When construing the language of the contract and determining to which circumstances it extends, courts "adhere to the 'plain meaning' rule in Virginia."  Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983).  Applying such rule, if an agreement is "plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself . . . because the writing is the repository of the final agreement of the parties." Id. (quoting Globe Company v. Bank of Boston, 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965)); see Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984) ("[C]ourts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein.").

Looking to the language of the policy before the court and adhering to the "plain meaning" rule, the court concludes that Johns Brothers' activities, including both delivering oil and maintaining the Claphams' heating system, do not create a course of conduct sufficient to establish that Johns Brothers was "performing operations" from October through January.  The language in subsection (d) of the policy, including the reference to mobile equipment, suggests that the contract provision applies to construction or installation projects, not infrequent oil delivery made pursuant to a contract.  The fact that Johns Brothers chose which days to fill the Claphams' tank or when to perform annual upkeep and inspections is insufficient to bring such

---

of the contract reveals that the pollution exclusion is a stand alone provision that is not impacted by the Products-completed operations hazard.  See Potter, 105 Fed. Appx. at 492-493 ("[O]n the face of the policy, the pollution exclusion clause and its interplay with 'completed-operations' coverage are not ambiguous.  Indeed, the structure of the policy evidences no tension between the two provisions.").  Such conclusion, however does not change the fact that subsection (d) of the pollution exclusion does have its own "timing" element and requires that the insured be "performing operations" when the pollution occurs.  As a result, the nature of plaintiff's activities and timing of the release are certainly relevant; however, they are relevant only within the dictates of the language in subsection (d) of the pollution exclusion.

activities into the purview of subsection (d).  Johns Brothers' activities are more correctly characterized as discrete supply and maintenance tasks, not ongoing operations.  In reaching such resolution, the court is mindful of the fact that "contracts must be considered as a whole 'without giving emphasis to isolated terms.'"  Plunkett v. Plunkett, 271 Va. 162, 167, 624 S.E.2d 39, 42 (2006) (quoting American Spirit Ins. Co. v. Owens, 261 Va. 270, 275, 541 S.E.2d 553, 555 (2001)).  Therefore, rather than overanalyzing the phrase "performing operations," the court gave such phrase its ordinary meaning and construed it as used within the pollution exclusion as a whole.  Such construction indicates that defendant's activities did not constitute the performance of ongoing operations.

In addition to the fact that Johns Brothers' activities do not qualify as ongoing operations extending from October 2004 to the end of January 2005, West American fails to establish that the oil release occurred during one of the short time spans that Johns Brothers was actually on the Claphams' property delivering oil or maintaining the furnace.  The court recognizes the potential application of the exclusion if the facts established that a Johns Brothers' employee pumped heating oil directly onto the ground of a customer's property.  Likewise, such exclusion could potentially apply if an oil tank had a large hole in it and a substantial portion of the "release or spill" was occurring while oil was being pumped into the faulty tank.  However, here, the hole in the heating oil return line is sufficiently separate from Johns Brothers' activities, including both delivering oil and performing furnace maintenance.  Furthermore, because policy language "purporting to exclude coverage for certain events will be construed most strongly against the insurer," Johnson, 232 Va. at 345, 350 S.E.2d at 619, an oil leak unrelated to any "operations" performed on the furnace and unrelated to any "operations" involved in the delivery of oil does not fall within the pollution exclusion which only applies when a release or spill occurs while the

insured is "performing operations."  Therefore, construing the exclusionary policy language against the insured, the court determines both that Johns Brothers' activities did not constitute ongoing operations and that the facts before the court fail to establish that the release of the pollutant occurred during the short periods of time that Johns Brothers was actively performing work on the Claphams' property.[19]  As a result, the pollution exclusion does not bar coverage for the alleged damage caused by the release of heating oil.

## IV.  Conclusion

Although the court concludes that heating oil leaking into the ground is a pollutant within the policy before the court, subsection (d) of the pollution exclusion nevertheless fails to exclude coverage on these facts as Johns Brothers was not "performing operations" when the heating oil release occurred.  Therefore, for the reasons discussed more fully above, Johns Brothers' motion for summary judgment is **GRANTED**.  West American's motion for summary judgment is therefore **DENIED**.  Each party is required to bear its own costs and attorney's fees.

The Clerk is **REQUESTED** to mail copies of this Order to counsel of record.

**IT IS SO ORDERED.**

_____/s/_____
Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
June  13 , 2006

---

[19] A contrary result may be appropriate where the evidence establishes that an oil delivery company <u>caused</u> an oil leak while it was "performing operations."  However, here, the undisputed facts establish that the cause of the oil spill was the corrosion of an oil return line.